IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT


CIVIL ACTION NO. 3:17-cv-102 (WOB)

RIVER CITY FRATERNAL ORDER
OF POLICE LODGE 614, INC., ET AL.                    PLAINTIFFS


VS.                    MEMORANDUM OPINION AND ORDER


KENTUCKY RETIREMENT
SYSTEMS                                              DEFENDANT


        This case presents a purported conflict between state and federal law.
Plaintiffs are a group of retired county police officers who brought this lawsuit
challenging Defendant Kentucky Retirement Systems' decision to terminate retirees'
state-funded health insurance coverage upon their becoming eligible for Medicare.
That health insurance, Plaintiffs claim, is one of the retirement benefits guaranteed
by the "inviolable contract" Kentucky formed with Plaintiffs pursuant to KRS
§ 78.852. When Kentucky Retirement Systems informed Plaintiffs that their health
insurance coverage was being terminated due to the mandates of the Medicare
Secondary Payer statute, 42 U.S.C. § 1395y, Plaintiffs contend Defendant thereby
breached the "inviolable contract." Plaintiffs allege five counts:

        **Count I:** Relief under the Kentucky Declaratory Judgments Act


*River City Fraternal Order of Police Lodge 614, Inc.* et al.
*v. Ky. Retirement Sys.*

1

**Count II:** Breach of the "inviolable contract" established by KRS § 78.852

**Count III:** Recovery pursuant to the doctrine of equitable estoppel

**Count IV:** Violation of § 2 of the Kentucky Constitution

**Count V:** Violation of the Medicare Secondary Payer statute, 42 U.S.C. § 1395y

Plaintiffs seek relief in the form of (i) a declaratory judgment; (ii) an injunction prohibiting the above described practice and requiring Retirement Systems to retroactively reinstate Plaintiffs' health insurance coverage; (iii) damages for expenses incurred as a result of any prior termination of health insurance coverage; and (iv) double damages pursuant to the Medicare Secondary Payer statute. (Doc. 6 at 8, 9–10).

This matter is now before the Court on Defendant's motion for summary judgment (Doc. 12), and Plaintiffs' cross-motion for partial summary judgment (Doc. 21).[1] The Court previously heard oral argument on the parties' motions and took the matter under submission. (Doc. 29).

In the interest of addressing all the issues, the opinion that follows is somewhat lengthy and involves the analysis of several complex medical insurance statutes and regulations.

---

[1] Plaintiffs have moved for summary judgment on all Counts, except for their equitable estoppel claim asserted in Count III. (Doc. 21-1 at 2, 30).

## FACTUAL AND PROCEDURAL BACKGROUND

Neither party disputes the material facts pertaining to the issues before the Court. Plaintiffs are members of the River City Fraternal Order of Police Lodge 614, Inc., ("FOP 614"), and former Jefferson County and Louisville Metropolitan police officers who have retired under the County Employees Retirement System ("CERS"). (Doc. 6, ¶ 2). The CERS is administered by the nominal Defendant in this case, the Board of Trustees for Kentucky Retirement Systems (the "Board"). *Id.*[2] After retiring, the named Plaintiffs re-entered employment with another employer that offers a group health insurance plan. *Id.* at ¶ 3; *see* (Doc. 21-3, Hr'g Tr. at 58–66, 81–86).

In consideration for the contributions made by Plaintiffs during their employment, and by virtue of the "inviolable contract" established between Plaintiffs and the Commonwealth of Kentucky under KRS § 78.852, Plaintiffs received "hospital and medical insurance" coverage at no cost as one of their retirement benefits. According to Plaintiffs, their health insurance coverage could not be altered or impaired. (Doc. 6, ¶¶ 10–11).

Sometime in March 2017, however, Kentucky Retirement Systems ("Retirement Systems") mailed a health insurance Termination Letter to

---

[2] The Board administers the retirement funds for not only the CERS but also the State Police Retirement System and the Kentucky Employees Retirement System. KRS §§ 61.645, .701–.702; *Commonwealth v. Ky. Ret. Sys.*, 396 S.W.3d 833, 837 (Ky. 2013).

approximately 130 individuals, like Plaintiff John Arnold, who: (a) had retired under the CERS; (b) subsequently had taken employment with an employer that offers group health insurance; and (c) were eligible, or about to become eligible, for Medicare as a result of turning 65 years of age. *Id.* at ¶¶ 12–13; (Doc. 21-3, Hr'g Tr. at 129–31).

The triggering event that prompted Retirement Systems to send the Termination Letters was that Plaintiffs were "Medicare eligible." *See* (Doc. 21-4, Termination Letter; Doc. 21-3, Hr'g Tr. at 129–31).[3]

The letters informed the retirees that the federal Medicare Secondary Payer statute "mandates" that Retirement Systems "cannot offer coverage secondary to Medicare." (Doc. 21-4; Doc. 6, ¶ 12). As such, the letter concludes by declaring that "your health insurance coverage through [Retirement Systems] will be terminated effective June 30, 2017" and "the dependents on your policy will no longer be eligible to participate in [Retirement Systems'] group health insurance." (Doc. 21-4).[4]

---

[3] Notably, the minutes from the Board's February 2010 meeting and Kentucky regulations promulgated by the Board dispel any doubt that Retirement Systems administers the plan for retirees based on Medicare eligibility. (Doc. 12-5 at 4) ("Any *Medicare-eligible* member who retires . . . is not eligible to receive" the coverage offered by Retirement Systems); 105 KAR 1:410 § 5(1) ("A recipient, spouse, or dependent who is Medicare eligible shall not participate in the non Medicare eligible group health plan offered through Kentucky Retirement Systems.").

[4] Plaintiffs and other similarly situated retirees allegedly received a similar letter in 2016, after which their health insurance was terminated and then later reinstated without explanation, causing Plaintiffs to unnecessarily pay insurance premiums. (Doc. 6, ¶ 4).

*River City Fraternal Order of Police Lodge 614, Inc.* et al.
*v. Ky. Retirement Sys.*

Believing that the Medicare Secondary Payer Statute does not "mandate" such a result, (Doc. 6, ¶¶ 14, 16–17), on June 16, 2017, Plaintiffs filed suit against Retirement Systems in state court, along with a motion for a restraining order. (Doc. 1-8 at 5–30). Once the issues were fully briefed, the court held a hearing on June 20, 2017. *Id.* at 174–177.

At the hearing, Retirement Systems' Division Director for Retiree Healthcare confirmed under oath that the Termination Letters were *only* sent to those retirees who: (i) had retired under Retirement Systems; (ii) re-entered the workforce with an employer that offered a health plan; and (iii) were about to become Medicare eligible by virtue of turning 65 years of age. (Doc. 21-3 at 129–31).

As the Division Director further testified, an individual's re-employment status alone does not trigger a termination notice, (Doc. 21-3 at 129–30); nor is any distinction made between individuals who are re-employed with a Retirement Systems participating employer and those who are not. *Id.* at 131–32. In fact, a retiree in Plaintiffs' position may be re-employed for years before they receive a Termination Letter. *Id.* at 130. It is only once an individual has turned or is about to turn age 65 (making the individual Medicare eligible) that Retirement Systems sends its Termination Letter. *Id.* Specifically, the Termination Letter is sent "six weeks before they age into 65" or otherwise become eligible for Medicare. *Id.*

Indeed, Plaintiff Arnold testified that after retiring he was employed with the

Jefferson County Coroner's Office for over 15 years before he received notice that his health insurance coverage was being terminated. *Id.* at 82. In short, Plaintiffs' younger, Medicare-ineligible (and otherwise similarly situated) co-workers are permitted to continue to enjoy the benefits of health care coverage at no cost.

After the hearing, on June 26, 2017, the state court issued a restraining order enjoining Retirement Systems from terminating the health insurance for affected retirees. (Doc. 1-8 at 175). The Board then filed a motion to dissolve the restraining order, *id.* at 188, and Plaintiffs filed a motion for a temporary injunction. (Doc. 1-9 at 6). A hearing was held on July 20, 2017. (Doc. 21-3). On September 25, 2017, the court issued its order, denying Plaintiffs' motion and stating that the restraining order would be dissolved on November 1, 2017. (Doc. 1-3 at 6). When Plaintiffs' health insurance was terminated, Plaintiffs allegedly incurred medical expenses that otherwise would have been covered under Retirement Systems' health insurance plan. (Doc. 6, ¶¶ 16–17).

Subsequently, the state court permitted Plaintiffs to amend their complaint to add a claim under the Medicare Secondary Payer statute. (Docs. 1-4, 1-5). On December 13, 2017, the Board timely removed the case to federal court. (Doc. 1). After a number of the motions now pending were filed by the parties, the assigned judge recused, and the case was reassigned to the undersigned. (Doc. 17).

*River City Fraternal Order of Police Lodge 614, Inc.* et al.
*v. Ky. Retirement Sys.*

## LEGAL STANDARD

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a)–(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). "A *genuine* issue of *material* fact exists when, 'there is sufficient evidence . . . for a jury to return a verdict for that party.'" *White v. Wyndham Vacation Ownership, Inc.,* 617 F.3d 472, 475–76 (6th Cir. 2010) (emphasis added) (quoting *Anderson*, 477 U.S. at 249). Where the issue is a "pure question of law," extraneous facts that do not bear on that question are "immaterial." *See, e.g.*, *Chappell v. City of Cleveland*, 585 F.3d 901, 909–914 (6th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)).

"The summary judgment standard does not change simply because the parties presented cross-motions." *Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 311 (6th Cir. 2010). The "court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (citations and internal quotation marks omitted).

## ANALYSIS

## I.     RETIREMENT SYSTEMS' PREEMPTION DEFENSE AND PLAINTIFFS' CLAIM UNDER THE MEDICARE SECONDARY PAYER STATUTE

*River City Fraternal Order of Police Lodge 614, Inc.* et al.
*v. Ky. Retirement Sys.*

Plaintiffs allege they were guaranteed health care coverage at no cost by virtue of the "inviolable contract" created by KRS § 78.852. It is undisputed that Retirement Systems terminated Plaintiffs' health care coverage. (Doc. 23-1 at 1). The Board contends, however, that continuing Plaintiffs' coverage would violate the Medicare Secondary Payer statute, 42 U.S.C. § 1395y. (Doc. 12-1 at 20–22).

In opposition, Plaintiffs argue that not only does the Medicare Secondary Payer statute not require Retirement Systems to terminate Plaintiffs' coverage, but Retirement Systems, in fact, violated the Medicare Secondary Payer statute by terminating Plaintiffs' no-cost health insurance. (Doc. 16 at 18). Thus, the outcome of these motions turns largely on the proper construction of the Medicare Secondary Payer statute and whether it preempts the "inviolable contract" established by Kentucky statute.

### A. Preemption Principles

Because federal law is "the supreme Law of the Land," state law must yield. U.S. CONST. art. VI, cl. 2. Preemption can be expressed (in the text of the statute) or implied by way of field preemption or conflict preemption. *Fednav, Ltd. v. Chester*, 547 F.3d 607, 618–19 (6th Cir. 2008). Here, the Board asserts that conflict preemption applies. (Doc. 12-1 at 22). The Court agrees.

"Conflict preemption" exists in "two forms: (i) impossibility preemption, where it is impossible for a private party to comply with both state and federal law, and (ii)

obstacle preemption, where the state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (citations and internal quotation marks omitted). "Impossibility preemption" applies here, and indeed that is the theory under which the Board appears to advance its defense.

"Impossibility pre-emption is a demanding defense." *Yates v. Ortho-Mcneil-Janssen Pharms., Inc.*, 808 F.3d 281, 294 (6th Cir. 2015) (quoting *Wyeth v. Levine*, 555 U.S. 555, 573, (2009)). The analysis requires a court to:

> [1] [S]tart with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. Then, [2] we identify the defendant's duties under state law. Next, [3] we ascertain whether federal law expressly prohibits the defendant from complying with state law. If federal law does not expressly prohibit the defendant from complying with state law, then [4] we determine whether the defendant has presented clear evidence that the [federal government] would have prohibited the defendant from taking the necessary steps under state law.

*Yates*, 808 F.3d at 294 (internal citations and quotation marks omitted).

Therefore, before turning to the Medicare Secondary Payer statute, the Court must examine the constraints imposed on Retirement Systems under Kentucky law.

## B. Kentucky's "Inviolable Contract" and Related Provisions

In a bold enactment, Kentucky formed an "inviolable contract" by statute, under which retirees like Plaintiffs are guaranteed to receive health insurance at no cost. *See, e.g.*, KRS § 78.852; *Commonwealth v. Ky. Ret. Sys.*, 396 S.W.3d 833, 837–

38 (Ky. 2013); *Jones v. Bd. of Trs. of Ky. Ret. Sys.*, 910 S.W.2d 710, 712–13 (Ky. 1995) (interpreting KRS § 61.692, applicable to state employees, which contains language identical to § 78.852); *Lawson v. Ky. Ret. Sys.*, 291 S.W.3d 679, 682 (Ky. 2009) (Abramson, J., concurring).

With limited exceptions not applicable here, § 78.852(1) states that:

> For members who begin participating in the County Employees Retirement System prior to January 1, 2014, it is hereby declared that **in consideration of the contributions by the members** and in further consideration of benefits received by the county from the member's employment, **KRS 78.510 to 78.852 shall constitute an inviolable contract of the Commonwealth, and the benefits provided therein shall not be subject to reduction** or impairment by alteration, amendment, or repeal.

KRS § 78.852(1) (emphasis added). Thus, the "inviolable contract" encompasses the benefits enumerated under KRS §§ 78.510–78.852. Pursuant to KRS § 78.545(35), a "[h]ospital and medical insurance plan," is prescribed as one of the guaranteed benefits, and KRS § 61.702 is incorporated by reference.

KRS § 61.702 establishes a source of funding for the health insurance plan for retirees. In part, § 61.702 provides:

> The board of trustees of Kentucky Retirement Systems shall arrange by appropriate contract or on a self-insured basis to provide a group hospital and medical insurance plan for present and future recipients of a retirement allowance from the . . . County Employees Retirement System . . . . The board shall also arrange to provide health care coverage through [a licensed insurer] as an alternative to group hospital and medical insurance . . .

*River City Fraternal Order of Police Lodge 614, Inc.* et al.
*v. Ky. Retirement Sys.*

KRS § 61.702(1)(a)(1).[5]

The established hospital and medical insurance plan is offered at "no cost" to retirees, like Plaintiffs, who were initially hired prior to July 1, 2003, and have since provided at least 20 years of service. (Doc. 21-3 at 123–24); *see* KRS § 61.702(2)(a)–(b), (3)(a)(6). In addition, spouses and dependent children can be added to an individual's health plan. KRS § 61.702(4)(a).

The health plan premiums are then paid "[i]n full" with funds from Retirement Systems' insurance trust fund. *Id.* § 61.702(3)(a)(6). The trust, in turn, is funded by participating employer contributions deducted from each employee's compensation. *See id.* § 61.702(2)(a)–(b). These payroll deductions are not optional. *Id.* § 61.702(2)(b)(4).

In light of the above statutory regime, Retirement Systems is obligated to provide health insurance at no cost to *all* retirees (and their dependents) who began participating in CERS prior to January 1, 2014, regardless of Medicare eligibility, unless doing so would conflict with federal law.[6]

---

[5] The amendments to KRS § 61.702, outlined in 2018 Ky. Acts 107, § 30, effective July 14, 2018, and 2018 Ky. Acts 151, § 6, effective April 13, 2018, did not alter the above quoted language of subsection (a).

[6] *See, e.g.*, *Baker v. Commonwealth*, No. 2005-CA-00158, 2007 WL 3037718, at *2, *31–37 (Ky. Ct. App. Oct. 19, 2007) (holding that plaintiff's right to the claimed retirement health care benefit is statutory and inviolable, and that Retirement Systems' policy requiring retiree's new employer to pay first toward retiree's health premium is void because it violates Kentucky statutes); *id.* at *38–40 (ordering Retirement Systems to pay damages in the amount of the full state contribution

## C. The Medicare Secondary Payer Statute

The Medicare federal health insurance program, 42 U.S.C. §§ 1395 *et seq.*, originally operated as the *primary* payer of health costs for eligible individuals. *Stalley v. Methodist Healthcare*, 517 F.3d 911, 915 (6th Cir. 2008) (citing 42 U.S.C. § 1395c). Congress changed this in 1980 by enacting the Medicare Secondary Payer statute, 42 U.S.C. § 1395y (the "Act"), making private insurers covering the same treatment the "primary payers" and Medicare the "secondary payer." *Bio-Medical Applications of Tenn., Inc. v. Cent. States Southeast & Southwest Areas Health & Welfare Fund*, 656 F.3d 277, 278, 281 (6th Cir. 2011) (citing 42 U.S.C § 1395y(b)).

This was done in order to "curb skyrocketing health costs and preserve the fiscal integrity of the Medicare system." *In re Avandia Mktg., Sales Practices & Products Liab. Litig.*, 685 F.3d 353, 363 (3d Cir. 2012). As a result, "when payment is available from a primary plan, the primary plan and not Medicare is responsible for paying the costs of the individual's medical treatment." *Mich. Spine & Brain Surgeons, PLLC v. State Farm Mut. Auto. Ins. Co.*, 758 F.3d 787, 790 (6th Cir. 2014).

The *only* exception is that if "'a primary plan . . . has not made or cannot reasonably be expected to make payment with respect to such item or service promptly[,]' Medicare may conditionally pay for the cost of the treatment." *Id.*

---

rate toward plaintiff's health insurance).

(quoting 42 U.S.C. § 1395y(b)(2)(B)(i)). In turn, the Act has the practical effect of preventing the "shifting of costs from private plans to the public fisc . . ." *Bio-Medical*, 656 F.3d at 282.

To achieve its objective, the Act is divided into three subparagraphs relevant to the facts of this case. First, subparagraph (b)(1) imposes certain nondiscrimination requirements on employer group health plans. Second, subparagraph (b)(2) designates Medicare as the "secondary payer" and limits when Medicare may pay for health care. Finally, subparagraph (b)(3) establishes a private cause of action.

Plaintiffs advance their federal claim in Count V under the private cause of action established by the Act, which provides:

> There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).

42 U.S.C. § 1395y(b)(3)(A). The two paragraphs referred to are, respectively, subparagraphs (b)(1) and (b)(2). The pertinent portion of subparagraph (b)(2) states that Medicare cannot, "except as provided in subparagraph (B),"[7] make a payment if:

(i) payment has been made [under a group plan],[8] or can reasonably be

---

[7] Subparagraph (b)(2)(B) is the exception carved out that permits Medicare to make a payment "conditioned on reimbursement" if a primary plan that should pay "cannot reasonably be expected" to pay "promptly." *Id.* § 1395y(b)(2)(B)(i); *Bio-Medical*, 656 F.3d at 285.

[8] For purposes of 42 U.S.C. § 1395(b)(2)(A)(i), the Act uses the term "primary plan" to

expected to be made [under a group plan], . . . as required under paragraph (1) . . .

*Id.* § 1395y(b)(2)(A)(i); *see Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 414 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 1147; *Bio-Medical*, 656 F.3d at 286.[9] Paragraph (1) (*i.e.*, subparagraph(b)(1), which is captioned "Requirements of group health plans"), in general terms "prevent[s] group health plans from 'taking into account' that a planholder is entitled to Medicare benefits due to being: (a) at least sixty-five years old, (b) disabled, or (c) diagnosed with end-stage renal disease." *Bio-Medical*, 656 F.3d at 285 (emphasis added).

Here, the parties agree that Retirement Systems administers a group health plan. (Doc. 12-1 at 8; Doc. 15 at 3 n.2; Doc. 21-1 at 13).[10] Further, the facts of the

---

mean "a group health plan." *Id.* § 1395y(b)(2)(A).

[9] In the end, the rule has the practical effect of furthering the goal of the Act, which is "to lower overall federal Medicare disbursements by requiring Medicare beneficiaries to *exhaust all available insurance coverage* before looking to Medicare's coverage." *Fanning v. United States*, 346 F.3d 386, 389 (3d Cir. 2003) (emphasis added). The thrust of Plaintiffs' claim under the Act, however, is on the nondiscrimination provisions in subparagraph (b)(1).

[10] A "group health plan" is defined under subparagraph (b)(1) as: "a plan . . . contributed to by, an employer . . . or employee organization to provide health care (directly or otherwise) to the employees, *former employees*, the employer, others associated or formerly associated with the employer in a business relationship, or their families." 26 U.S.C. § 5000(b)(1) (emphasis added); 42 U.S.C. § 1395y(b)(1)(A)(v) (incorporating the definition in 26 U.S.C. § 5000(b)(1) of the Internal Revenue Code of 1986). The definition of "employer," however, is much broader under the Act, and covers government entities. *See* 42 U.S.C. § 1395y(b)(1)(A)(v) (excluding 26 U.S.C. § 5000(d), which would otherwise limit the term "employer" to include only private entities); 42 C.F.R. § 411.101(2). As such,

instant case only implicate the first criterion of Medicare eligibility, age.

Thus, the relevant nondiscrimination requirements in subparagraph (b)(1) appear under the heading "Working aged under group health plans." 42 U.S.C. § 1395(b)(1)(A). That subsection imposes two nondiscrimination requirements on an *employer-provided* group health plan. In particular, the group health plan:

> (I) may not take into account that an individual (or the individual's spouse) who is *covered* **under the plan** *by virtue of the individual's current employment status* with an employer is entitled to [Medicare] benefits . . . , and

> (II) shall provide that any individual age 65 or older (and the spouse age 65 or older of any individual) *who has current employment status* with an employer shall be entitled to the same benefits under the plan under the same conditions as any such individual (or spouse) under age 65.

42 U.S.C. § 1395y(b)(1)(A)(i) (emphasis added). The second nondiscrimination provision is straightforward and unambiguous.

With respect to the first nondiscrimination provision, however, the Act does not define what it means to "take into account." But the Sixth Circuit has reasoned that based on the "ordinary" meaning of "take into account" and the Act's implementing regulations, a group health plan impermissibly "takes into account" or "consider[s]" a beneficiary's Medicare eligibility when it terminates coverage and does so because the individual is eligible for Medicare benefits. *Bio-Medical*, 656 F.3d at

---

the Act explicitly contemplates individuals, like Plaintiffs, who are "former employees" of a government entity that provides a group health plan.

282 ("[T]ermination of coverage due to entitlement to Medicare benefits" is prohibited.); 42 C.F.R. § 411.108(a)(3) (establishing that one example of "taking into account" is "[t]erminating coverage because the individual has become entitled to Medicare").[11]

However, the above nondiscrimination provisions in § 1395y(b)(1)(A)(i) are only applicable where coverage under a group health plan is provided through an employer "by virtue of the individual's *current employment status.*" *See, e.g.*, 42 U.S.C. § 1395y(b)(1)(A)(i) (emphasis added); *Baptist Mem'l Hosp. v. Pan Am. Life Ins. Co.*, 45 F.3d 992, 996 (6th Cir. 1995); *Perry v. United Food & Commercial Workers Dist. Unions 405 & 442 & Retail Food*, 64 F.3d 238, 243–44 (6th Cir. 1995); *Harris Corp. v. Humana Health Ins. Co. of Fla.*, 253 F.3d 598, 601 (11th Cir. 2001); 42 C.F.R. § 411.172(a).[12] **Nothing in the Act or its implementing regulations governs group**

---

[11] The *Bio-Medical* court held that 42 C.F.R. § 411.108 is an agency interpretation of the Act entitled to deference because it is, of course, reasonable and furthers the Act's "goal of preventing private plans from shifting costs to Medicare." *Bio-Medical*, 656 F.3d at 282 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984)). Other examples of "taking into account" Medicare eligibility include: "Imposing limitations on benefits for a Medicare entitled individual that do not apply to others enrolled in the plan, such as . . . reducing benefits[]"; and "informing the beneficiary of the right to accept or reject the employer plan but failing to inform the individual that, if he or she rejects the plan, the plan will not be permitted to provide or pay for secondary benefits." 42 C.F.R. § 411.108(a)(5) & (9).

[12] The Act provides that "[a]n individual has **'current employment status'** . . . if the individual is an employee, is the employer, or is associated with the employer in a business relationship." 42 U.S.C. § 1395y(b)(1)(A)(ii) (emphasis added). Federal

health plans that provide coverage to those over age 65 for reasons other than current employment status.

Here, Plaintiffs' coverage through Retirement Systems is by virtue of Plaintiffs' *retiree status* under the "inviolable contract." The Act does not apply to the group health plan Retirement Systems provides to *retirees* because coverage is not offered as a result of the "current employment status" of Plaintiffs or their spouses. Thus, the Act does *not require* that Retirement Systems terminate the health insurance guaranteed to Plaintiffs under the "inviolable contract," and it does not conflict with state law such that it is "impossible" for Retirement Systems to fulfill its obligations

---

regulations further explain that:

> An individual has coverage by virtue of current employment status with an employer if—
>
> > (1) the individual has GHP or LGHP coverage based on employment, including coverage based on a certain number of hours worked for that employer or a certain level of commissions earned from work for that employer at any time; and
> >
> > (2) the individual has current employment status with that employer, as defined in paragraph (a) of this section.

42 C.F.R. § 411.104(c). The substance of paragraph (a) defines an individual with "current employment status" as someone who "is actively working as an employee, is the employer (including a self-employed person), or is associated with the employer in a business relationship." *Id.* § 411.104(a). Thus, the agency's interpretation is consistent with the Act.

under Kentucky law. Therefore, the Board's preemption defense is without merit.

> **1. The Age-Based Nondiscrimination Provisions in the Act Do Not Apply to Retirement Systems'** *Retiree* **Group Health Plan, and Plaintiffs Have No Cause of Action Under the Act.**

Plaintiffs argue Retirement Systems violated both of the above-noted nondiscrimination requirements by terminating Plaintiffs' coverage when they became eligible for Medicare. (Doc. 6, ¶¶ 37–40); *cf.* 42 U.S.C. § 1395y(b)(1)(A)(i). Plaintiffs' theory fails.

The Act does not prohibit Retirement Systems from using Medicare-eligibility as a classification for determining retiree coverage. This is because, as noted, the plain language of the above nondiscrimination requirements, § 1395y(b)(1)(A)(i), evinces Congress' intent that the requirements apply only when coverage under the plan is provided "by virtue of the individual's current employment status." *See, e.g.*, *Baptist Mem'l*, 45 F.3d at 996; *Harris Corp.*, 253 F.3d at 601, 605. And here, it is undisputed that Plaintiffs' coverage through Retirement Systems was by virtue of their status as retirees—and not as current employees of Jefferson County (or spouses of current employees). Therefore, the Act is wholly inapplicable to either of the party's theories.

The Sixth Circuit's decision in *Baptist Memorial* aptly demonstrates when the Act applies. In that case, *a retired* postal worker, Horace Thomas, was covered by three separate health benefit plans: (a) a Blue Cross/Blue Shield plan offered through

the Federal Employees Health Benefit Program; (b) a Pan American Life Insurance Company plan offered through the employer of Thomas' wife, under which Thomas was a dependent; and (c) Medicare. 45 F.3d at 993–94.

When Thomas was hospitalized for several months after an automobile accident, the hospital demanded that Pan Am pay Thomas' hospital bill of almost $600,000. *Id.* at 993. Pan Am claimed Blue Cross was the primary payer but Blue Cross argued that Pan Am was the primary payer. The hospital never requested payment from Medicare, and instead, the hospital brought suit against the two insurance providers. *Id.*

Pursuant to the coordination of benefits provisions in the Blue Cross and Pan Am plans, Blue Cross' coverage was primary to any Pan Am coverage. *Id.* But if Medicare were involved, the Pan Am coverage would be primary, Medicare coverage would be secondary, and the Blue Cross coverage would be tertiary. *Id.*

In interpreting the Act, the Sixth Circuit held that the Act's nondiscrimination requirements for group health plans in 42 U.S.C. § 1395y(b)(1)(A)(i), "would affect Pan Am, under the circumstances . . . but not Blue Cross" because "Pan Am covered Mr. Thomas by reason of the current employment of his spouse, so Pan Am was precluded by law from making the [Pan Am] plan's coverage secondary to Medicare's." *Id.* at 996 (citation and internal quotation marks omitted). The Act simply had no impact on the plan's language or the parties' dispute. As the court explained:

What difference does [the Act] make as far as priority of payment obligations between Blue Cross and Pan-Am is concerned? None at all, in our view, on the facts presented here.

\*\*\*

There is no mention of the Federal Employees Health Benefits Program in the [Act]. The statute relegates Medicare to the status of a "secondary payer" *vis-a-vis* a group health plan under which an individual is entitled to benefits by virtue of his current employment status (or that of his spouse), but the [Act] simply does not say that a Federal Health Benefits Program contractor such as Blue Cross is a secondary payer *vis-a-vis* an insurance carrier that provides coverage by virtue of someone's current employment status.

\*\*\*

The sole interest of Congress, as far as the statute discloses, was to provide that Medicare would not have to pay ahead of private carriers in certain situations.

*Id.* at 996–97, 998.

The reasoning in *Baptist Memorial* squares with the facts of this case. As in *Baptist Memorial*, Plaintiffs in this case were covered or otherwise were eligible to be covered by three separate health plans: (a) Retirement Systems' plan offered to retirees at no cost; (b) the employer-sponsored health plan offered by Plaintiffs' current employer; and (c) Medicare. Under the Coordination of Benefits provisions in the plans Retirement Systems offered to employees and retirees in 2017, the Board is correct insofar as it maintains that Medicare is primary and Retirement Systems' coverage is secondary when a retiree is Medicare-eligible.[13] But that aspect of the

---

[13] *See, e.g.*, (Doc. 27-1 at 63–66; Doc. 27-3 at 63–66; Doc.27-5 at 64–67; Doc. 27–7 at 63–66; Doc. 27–9 at 272–75); (Doc. 21-3, Hr'g Tr. at 125–126).

parties' dispute is irrelevant.

Retirement Systems' Humana administered plan is what is known as a "Medicare Advantage" plan.[14] The Medicare Advantage program specifically references the Act in question here and explicitly permits a Medicare Advantage plan to take "secondary payer status" in relation to Medicare. *See, e.g., Humana Med. Plan*, 832 F.3d at 1238; *In re Avandia Mktg.*, 685 F.3d at 358, 366; 42 U.S.C. § 1395w-22(a)(2)(A) & (a)(4).[15]

---

[14] *See* (Doc. 27–9 at 1). Pursuant to the Medicare Advantage program, "a private insurance company, operating as [a] [Medicare Advantage Organization ("MAO")], administers the provision of Medicare benefits pursuant to a contract with [the Centers for Medicare & Medicaid Services ("CMS")]. CMS pays the MAO a fixed fee per enrollee, and the MAO provides at least the same benefits as an enrollee would receive under traditional Medicare." *Humana Med. Plan, Inc. v. Western Heritage Ins. Co.*, 832 F.3d 1229, 1235 (11th Cir. 2016) (citing 42 U.S.C. §§ 1395w-22(a), 1395w-23). However, Medicare does not fully cover certain health care services. *See, e.g.*, 42 U.S.C. § 1395e(a)(3). In that case, one option for the employee is to purchase a "Medigap" policy to augment Medicare's coverage. *Id.*; *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1367 (11th Cir. 1997) (noting that Medicare is primary under a Medigap policy); *see also Shalala*, 23 F.3d at 420 ("The working aged are free to purchase 'Medigap' policies on their own."). Under the Act's nondiscrimination provisions, *employers* cannot offer their Medicare-eligible employees only "Medigap" coverage, while offering comprehensive coverage to their other employees. *See Shalala*, 23 F.3d at 420; 42 U.S.C. § 1395y(b)(1)(A)(i); *cf.* 42 C.F.R. § 411.32(a)(1) ("Medicare benefits are secondary to benefits payable by a primary payer even if State law or the primary payer states that its benefits are secondary to Medicare benefits or otherwise limits its payments to Medicare beneficiaries.").

[15] In 2017, Retirement Systems also offered two Preferred Provider Organization ("PPO") plans, (Doc. 27-5 at 22; Doc. 27-1 at 21), and two Consumer Direct (or "Driven") Health plans ("CDHP"), (Doc. 27-3 at 21; Doc. 27-7 at 21), all of which were administered by Anthem Blue Cross & Blue Shield.

Moreover, the critical fact in this case is that Retirement Systems was providing insurance coverage to Plaintiffs as *a former* employer—not as their current employer. Therefore, regardless of whether coverage is primary or secondary to Medicare under the terms of Retirement Systems' retiree plan, the Act has no impact on the dispute in this case because Plaintiffs' coverage through Retirement Systems is not as a result of their current employment status (or that of a spouse).

Notwithstanding, Plaintiffs insist that the challenged practice of the Board— *i.e.*, terminating retirees' health coverage when they become Medicare-eligible and thereby forcing them to either accept an employer-sponsored health plan or enroll in Medicare—unavoidably puts Medicare at risk of being the primary payer for an untold number of Plaintiffs who reject their employer-provided health plan. *See, e.g.*, (Doc. 16 at 19; Doc. 24 at 3). That may well be. But Congress evidently took a more limited approach and was not concerned with preventing Medicare from being the primary payer in every situation—the Act seeks to prevent only *employer-sponsored* group health plans from foisting medical costs on Medicare.

Thus, just as the Act did not affect the terms of the Blue Cross plan offered to federal *retirees* in *Baptist Memorial*, here, the Act also does not preclude Retirement Systems from making coverage for *retirees* secondary to Medicare. *See* 45 F.3d at 996; *Harris Corp.*, 253 F.3d at 601 ("[P]rivate plans covering such individuals for reasons other than current employment status of that individual or that individual's

spouse *may* make their coverage secondary to Medicare when those individuals are simultaneously eligible for Medicare." (emphasis in original)).

To be sure, the facts of this case are distinguishable from *Bio-Medical Applications of Tenn., Inc. v. Cent. States Southeast & Southwest Areas Health & Welfare Fund*, 656 F.3d 277 (6th Cir. 2011). In *Bio-Medical* the defendant terminated the patient's coverage because the patient became eligible for Medicare as a result of being diagnosed with end-stage renal disease. *Id.* at 282–83.

The defendant did so in spite of the "may-not-take-into-account-Medicare-benefits" language in the Act because its insurance policy provided that coverage "shall terminate" when "the insured first becomes entitled to Medicare benefits." *Bio-Medical*, 656 F.3d at 280. Bio-Medical brought suit because the patient had assigned her rights under the plan to Bio-Medical. *Id.*

The defendant-insurer did not contest that it qualified as a group health plan and thus the *Bio-Medical* panel concluded that defendant "violated the Act by terminating the patient's coverage" because she was eligible for Medicare. *Id.* at 283. As a result, the court added, "the plan provision terminating coverage for that reason is void for violating federal law, and [defendant's] decision to deny benefits is arbitrary and capricious for the same reason." *Id.* at 284.

In reaching the result in *Bio-Medical*, however, the court applied a different set of nondiscrimination provisions applicable to situations in which Medicare

eligibility is based—not upon age—but upon an end-stage renal disease diagnosis. *Id.* at 282 (citing 42 U.S.C. § 1395y(b)(1)(C)). That part of the Act prohibits group health plans from "taking into account" a beneficiary's Medicare eligibility due to end-stage renal disease. 42 U.S.C. § 1395y(b)(1)(C). But § 1395y(b)(1)(C) does not contain language to suggest that an individual's employment status limits the application of the prohibition.

By contrast, the application of the nondiscrimination provisions in question here is limited to situations where coverage under a group health plan is "by virtue of current employment status." *Compare* 42 U.S.C. § 1395y(b)(1)(A)(i), *with id.* § 1395y(b)(1)(C). This limitation is dictated by the unambiguous text of the Act. "A familiar principle of statutory construction . . . is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006). "Where Congress includes particular language in one section of a statute but omits it in another," as in this case, "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* (internal quotation marks omitted) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). Thus, the statutory provisions in question distinguish this case from the outcome in *Bio-Medical*.

That said, at the end of the day this does not mean that Retirement Systems

*must* terminate Plaintiffs' coverage. The Board argues, however, that once retirees become Medicare-eligible, Retirement Systems can no longer "offer Plaintiffs the [group health] plan, because Medicare is the primary payer under that plan, and Retirement Systems simply provides supplemental coverage." (Doc. 15 at 4).[16] To the contrary, Medicare is content to take "primary payer" status under the present facts. *See, e.g., Humana Med. Plan*, 832 F.3d at 1238; *Baptist Mem'l*, 45 F.3d at 996–97.

Of course, under the Board's self-serving interpretation of the Act, terminating Plaintiffs' coverage saves Retirement Systems the medical costs of retirees over the age of 65 (and their dependents). But the fact that Plaintiffs' current employers also offer a health plan that could serve as the primary payer is irrelevant under the Act. *Baptist Memorial* is on all fours on that point. 45 F.3d at 996–97.

As in *Baptist Memorial*, with respect to the Federal Employees Health Benefits Program, it bears emphasis that likewise there is no mention of Kentucky Retirement Systems' program in the Act. Congress was concerned with curbing Medicare expenditures *vis-a-vis* insurance carriers that provide coverage by virtue of a person's current employment status by making Medicare the secondary payer. *Baptist Mem'l*, 45 F.3d at 997. Where that interest is not implicated—and it does not seem to be

---

[16] In support, the Board repeatedly cites to 105 KAR 1:410 § 5(1), a regulation promulgated by the Board, which provides that "[a] recipient, spouse, or dependent who is Medicare eligible shall not participate in the non Medicare eligible group health plan offered through Kentucky Retirement Systems." This regulation, however, is irrelevant because it is state law that has no footing in the Act.

here—the Act does not apply. *Id.* at 998; *see also Perry*, 64 F.3d at 244; *Harris Corp.*, 253 F.3d at 601–06. Therefore, the Act provides no source of relief for Plaintiffs and offers no defense for Retirement Systems against Plaintiffs' state law claims.

Nor are the parties' contentions supported by the Act's implementing regulations. Consistent with the Act, the regulations reiterate the conditions under which Medicare coverage is secondary. In relevant part, Medicare benefits "are secondary to benefits payable by a [group health plan]" if the individual:

(1) Is aged;

(2) Is entitled to Medicare . . . ; and

(3) Meets one of the following conditions:

> (i) Is covered under a [group health plan] of an employer that has at least 20 employees (including a multi-employer plan in which at least one of the participating employers meets that condition), ***and coverage under the plan is by virtue of the individual's current employment status.***

> (ii) *Is the aged spouse* (including a divorced or common-law spouse) of an individual (of any age) ***who is covered under a [group health plan] . . . by virtue of the individual's current employment status***.

42 C.F.R. § 411.172(a) (emphasis added).

When applied here, this simply means that Medicare must be the secondary payer *vis-a-vis* any coverage Plaintiffs might receive from their current employers. It has absolutely no effect on the coverage Retirement Systems provides to *retirees*.

Because the Court concludes that the Act is inapplicable to Retirement

Systems' health care plan insofar as it provides coverage to Plaintiffs by virtue of their status as retirees, Plaintiffs have failed to establish a violation of the Act.

> 2. **Medicare has not Made a Payment on Plaintiffs' Behalf, and Therefore Plaintiffs Cannot Pursue a Claim Under the Act's Private Right of Action.**

The Act provides a private cause of action that is available when (1) a plan that is *primary* to Medicare under the Act "fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)," 42 U.S.C. § 1395y(b)(3)(A), and (2) thereby "caus[es] Medicare to step in and (temporarily) foot the bill." *Bio-Medical*, 656 F.3d at 286; *Baptist Mem'l*, 45 F.3d at 999.[17] Here, Plaintiffs' claim fails on both prongs. First, as discussed above, Retirement Systems did not, and cannot, violate "paragraphs (1) and (2)(A)" because the Act does not apply to the health plan Retirement Systems provides to retirees. But Plaintiffs' claim also falters on the second element because they do not allege that Medicare has paid any of their medical costs.

As the Sixth Circuit stated in *Baptist Memorial*, so too here: "Medicare has no dog in this particular fight. Medicare has never been asked to pay anything, as far as we know, and has not been made a party to the lawsuit." 45 F.3d at 998.

---

[17] The Act is not a *qui tam* statute, and thus, a plaintiff must demonstrate Article III standing by virtue of having suffered their own harm. *E.g., Stalley v. Methodist Healthcare*, 517 F.3d 911, 919 (6th Cir. 2008); *Stalley v. Mt. States Health Alliance*, 644 F.3d 349, 351 (6th Cir. 2011) ("No court has ever found that [the Act] is a *qui tam* statute[.]"); *Bio-Medical*, 656 F.3d at 296 n.17.

Courts unanimously agree that to sustain a "double-damages" claim pursuant to § 1395y(b)(3)(A), "Medicare must have *actually* made payments on the plaintiff's behalf" when the primary insurer was "'responsible' for paying the benefits at issue." *See, e.g.*, *Geer v. Amex Assurance Co.*, No. 09–11917, 2010 WL 2681160, at *4 (E.D. Mich. July 6, 2010) (emphasis added); *Humana Med. Plan*, 832 F.3d at 1239; *Glatthorn v. Independence Blue Cross*, 34 F. App'x 420, 422 (3d Cir. 2002) (dismissing the claim under the Act because "[plaintiffs] do not even allege that Medicare paid any amount toward their medical bills"); *Manning v. Utilities Mut. Ins. Co., Inc.*, 254 F.3d 387, 391–92 (2d Cir. 2001) ("Congress has authorized a private cause of action . . . against entities designated as primary payers that fail to pay for medical costs for which they were responsible, *which are borne in fact by Medicare*." (emphasis added)).[18] Plaintiffs have not cited a single case that states otherwise.

Therefore, in this case, Plaintiffs' claim under the Act fails because not only is

---

[18] *See also Pachaly v. Benefits Admin. Committee Unilever U.S. Inc.*, No. 3:11-cv-156 2013 WL 172993, at *4 (D. Conn. Jan. 16, 2013) (concluding that a claim does "not accrue until Medicare pays for benefits that the primary insurer has improperly failed to pay."); *Leggette et al. v. B.V. Hedrick Gravel & Sand Co. et al.*, No. 3:04-CV-00530-CH, 2006 WL 6809606, at *11 (W.D.N.C. May 24, 2006) ("[A] 'double damages' claim [under the Act] may be maintained only where Medicare has, *in fact*, paid claims that a primary insurer should have, but refused, to pay.") (emphasis added)); *Frazer v. Transcon. Ins. Co.*, 374 F. Supp. 2d 1067, 1078 (N.D. Ala. 2004) ("[S]uch a cause of action and the relief afforded by the statute arises only when a discrete claim has accrued and will be paid or has been paid by Medicare.").

the Complaint devoid of any allegation that Medicare has made a single payment on Plaintiffs' behalf, but Plaintiffs have not produced evidence demonstrating that Medicare has made such a payment. (Doc. 6, ¶¶ 16–17, 41). *But see Bio-Medical*, 656 F.3d at 280 (noting that Medicare *paid* Bio-Medical an amount that was less than what it would have received from defendant, the primary payer); *Duncan v. Liberty Mutual Insurance Company*, No. 17-1402, 2018 WL 3949129, at *1 (6th Cir. 2018) (involving "Medicare's payment of [plaintiff]'s medical expenses for his injuries from an automobile crash."); *Gucwa v. Lawley*, 731 F. App'x 408, 411, 414 (6th Cir. 2018) (alleging that Medicare paid plaintiff's treatment costs, which the insurer refused to cover). Here, Plaintiffs merely allege their own financial harm arising from the Board's actions. This is enough to confer standing on Plaintiffs under the Act. *See Gucwa*, 731 F. App'x at 413–14. But it does not bring Plaintiffs' claim within the ambit of the right of action created by the Act.

As the cases above demonstrate, the Act's private right of action incentivizes plaintiffs to aid the government in recovering payments that were in fact made by Medicare so that Medicare may then "pursue its reimbursement out of the proceeds recovered." *Bio-Medical*, 656 F.3d at 296 (citing 42 U.S.C. § 1395y(b)(2)(B)(iii)). Unless and until Medicare steps in and covers Plaintiffs' medical costs, their claim under the Act is neither ripe nor actionable.

Thus, even if payment by Medicare is "inevitable," as Plaintiffs contend (Doc.

16 at 8; Doc. 24 at 13), the right of action is limited to those instances where a *primary plan* "fails to provide for primary payment." 42 U.S.C. § 1395y(b)(3)(A). It simply does not extend to lawsuits for anticipated future Medicare expenditures, much less claims against a group health plan which, for all intents and purposes here, is secondary.[19]

The Sixth Circuit has counseled that where a federal statute "plainly and expressly limits private recovery" courts should "decline to expand the cause of action or to infer an implied one." *Roberts v. Hamer*, 655 F.3d 578, 583 (6th Cir. 2011); *cf. Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) ("Without [statutory intent], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."). As such, because Medicare did not "step in and (temporarily) foot the bill" for Plaintiffs' medical expenses, Plaintiffs' claim under the Act fails as a matter of law. *Bio-Medical*, 656 F.3d at 286.[20]

Accordingly, even if Retirement Systems had violated the Act, Plaintiffs nevertheless cannot prevail on their claim because Plaintiffs do not allege that

---

[19] *See supra* note 13.

[20] That discovery has not been conducted does not change the outcome. A prior payment by Medicare to cover a medical expense for a plaintiff is a matter of readily ascertainable fact. *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 901 (11th Cir. 2003). Indeed, such evidence in the form of a specific dollar amount would be information to which the individual plaintiff would have access—not a defendant like Retirement Systems. Opening Retirement Systems to discovery on this issue is not going to change the viability of Plaintiffs' claim under the Act.

Medicare has covered any of their health care costs. For all these reasons, Plaintiffs' claim under the Act (Count V) is dismissed with prejudice.

## II.  PLAINTIFFS' STATE LAW CLAIMS

Having concluded that Plaintiffs' only federal claim fails, this Court may exercise its discretion pursuant to 28 U.S.C. § 1367(c)(3) and dismiss the remaining supplemental state law claims or retain jurisdiction.[21] Both parties urge the Court to retain jurisdiction. (Doc. 12-1 at 27 n.16; Doc. 24 at 14).[22]

In light of the history of this case, and in connection with: (i) the substantial judicial resources that have already been committed; (ii) the fact that the above preemption analysis already involves an interpretation of Kentucky law and also disposes of the Board's primary defense against Plaintiffs' state law claims (*i.e.*, the Medicare Secondary Payer statute); and (iii) the reality that declining to exercise supplemental jurisdiction may result in a substantial duplication of effort if the matter is adjudicated in another court, this Court will retain jurisdiction over

---

[21] "[A] district court 'may' (rather than must) decline to exercise jurisdiction" and the decision to retain jurisdiction is based upon "judicial economy, convenience, fairness, and comity." *See, e.g.*, *Musson Theatrical v. Federal Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir. 2002).

[22] **The Court notes for the benefit of the parties that class certification under Federal Rule of Civil Procedure 23 is unobtainable because nothing in the record suggests that at least one Plaintiff is a citizen of a State other than Kentucky.** *See* 28 U.S.C. § 1332(d)(2).

*River City Fraternal Order of Police Lodge 614, Inc.* et al.
*v. Ky. Retirement Sys.*

Plaintiffs' remaining state law claims. *Blakely*, 276 F.3d at 863; *cf.* 16 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 106.66(3) (Matthew Bender 3d ed. 2018).

The Board's only remaining defense as to Plaintiffs' state law claims is sovereign immunity. For the reasons set forth below, the Court holds that by virtue of the Board having voluntarily removed this case from state court, Retirement Systems has waived any Eleventh Amendment immunity that it might otherwise enjoy in federal court against Plaintiffs' remaining state law claims.

### A. The Eleventh Amendment Does Not Bar Plaintiffs' State Law Claims.

"The Eleventh Amendment bars a suit brought in federal court against a state and its departments or agencies unless the state has waived its sovereign immunity or unequivocally consented to be sued." *Hill v. Michigan*, 62 F. App'x 114, 115 (6th Cir. 2003) (citing *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)).

Retirement Systems is a State agency that is an "arm, branch, or alter ego' of the state" and therefore may claim immunity under the Eleventh Amendment. *See Commonwealth v. Ky. Ret. Sys.*, 396 S.W.3d 833, 837–38 (Ky. 2013); KRS § 61.645(1); *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (*en banc*) (concluding that Michigan's retirement system is an arm of the State); *see also Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 681–82 (6th Cir. 2018) (listing the factors

relevant in determining whether an agency is an arm of the state).[23]

The Board has raised immunity as to Plaintiffs' state law claims, and thus the question remaining is whether Plaintiffs' supplemental claims may proceed, despite the Eleventh Amendment. *See Pennhurst*, 465 U.S. at 120. Retirement Systems carries the burden of showing that it is entitled to immunity. *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963–64 (6th Cir. 2002).

A State may waive its immunity by state statute or constitutional provision. *E.g.*, *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n.1 (1985); *see* Ky. Const. § 231 (granting the legislature the sole authority to waive sovereign immunity). But an express waiver of immunity by a State will only be found where the intent to do so is conveyed with "the most express language or by such overwhelming implication from the text as to leave no room for any other reasonable construction." *Edelman v. Jordan*, 415 U.S. 651, 673 (1974).

The Kentucky Supreme Court has recognized three circumstances in which the State's sovereign immunity has been waived: the assertion of a constitutional claim; a breach of contract with the State; or when a declaratory judgment is sought. *See*

---

[23] The factors include: (i) the State's "potential legal liability"; (ii) the language used "by state courts and statutes" to refer to an agency and the "degree of control and veto power" the state has over the agency; (iii) "whether state or local entities appoint board members" for the agency; and (iv) whether the agency's "functions fall under the traditional purview of state or local government." *Brent*, 901 F.3d at 681–82 (citation and internal quotations omitted).

*Cty. Emples. Ret. Sys. v. Frontier Hous., Inc.*, 536 S.W.3d 712, 714 & n.6 (Ky. Ct. App. 2017) (citing *Commonwealth v. Ky. Ret. Sys.*, 396 S.W.3d 833, 836–41 (Ky. 2013)); *cf.* KRS § 45A.245 (contracts with the State), KRS § 418.075 (Declaratory Judgment Act), and KRS §§ 61.692, 78.852 ("inviolable contract"); *see also Jones v. Bd. of Trs. of Ky. Ret. Sys.*, 910 S.W.2d 710, 713 (Ky. 1990) (holding that the governor and members of the General Assembly could not claim immunity in a suit for declaratory relief that involved impairment of retiree benefits under the "inviolable contract" created by statute).[24]

In *Commonwealth v. Ky. Ret. Sys.*, the court found the "inviolable contract" established by statute to be a "written contract" encompassed by Kentucky's immunity waiver under KRS § 45A.245. *See* 396 S.W.3d at 838; KRS § 78.852. Therefore, this Court holds that the Kentucky legislature has unambiguously waived Retirement Systems' immunity in state court for the type of state law claims that remain in this action.

The next question is the relief that this Court may grant on Plaintiffs' state law claims. This is critical because a State may waive its immunity as to one type of

---

[24] Although the Kentucky Supreme Court in *Commonwealth v. Ky. Ret. Sys.*, S.W.3d at 837–38, addressed a suit for breach of the inviolable contract created by KRS § 61.692 when the legislature enacted a statute that purported to limit retirement benefits for retirees who re-entered employment with a public agency, *id.* at 835, that provision mirrors KRS § 78.852. Indeed, the court noted the similarity, *id.* at 838 & n.1, and stated that plaintiffs' claim more appropriately arose under KRS § 78.852, the statute that is the subject of this case. *Id.* at 840.

relief and not another unless the statute "extend[s] unambiguously" to cover such relief. *Sossamon v. Texas*, 563 U.S. 277, 285 (2011).

In that regard, the Kentucky Supreme Court recently clarified that under KRS § 45A.245(1), "without restriction or limitation[,] . . . the legislature has waived governmental immunity on *all* claims brought by *all* persons on *all* lawfully authorized written contracts with the Commonwealth." *Univ. of Louisville v. Rothstein*, 532 S.W.3d 644, 650–51 (Ky. 2017) (emphasis in original).

It follows then that Kentucky has waived its immunity—and by extension Retirement Systems' immunity as an arm of the State—as to all claims arising from the "inviolable contract" established by statute, including claims for monetary and injunctive relief. The only problem is that the immunity waiver under KRS § 45A.245(1) only applies in Kentucky state courts—not in federal court.

To be sure, a State can waive immunity by statute as to one forum and not another. *See, e.g., College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999); *Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 303, 307 (1990) (holding that State's waiver could be limited by state statute to suits "laid within a county or judicial district" that is "situated wholly or partially within the Port of New York District"). Thus, "a State's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts." *Pennhurst*, 465 U.S. at 99 n.9. To constitute a waiver of Eleventh

Amendment immunity in federal court, the statute "must specify the State's intention to subject itself to suit in *federal court*." *See, e.g., Scanlon*, 473 U.S. 234 (emphasis in original); *Akers v. Cty. of Bell*, 498 F. App'x 483, 490 (6th Cir. 2012) (holding that the waiver of sovereign immunity in a Kentucky statute applied only in Kentucky state courts and did not amount to a waiver of immunity in the federal courts); *Rose v. Stephens*, 291 F.3d 917, 925 (6th Cir. 2002) (same).

By its own terms, KRS § 45A.245 only waives the State's immunity in state court, specifically Franklin Circuit Court.[25] KRS § 45A.245 contains no indication that the State intended that its agencies be subject to suit in federal court. Likewise, Kentucky's Declaratory Judgment Act, KRS § 418.075, adds nothing to suggest a waiver of immunity. Nor is KRS § 61.645 sufficient to constitute a waiver simply because it states that the Board may "sue and be sued." *College Sav. Bank*, 527 U.S. at 676. Thus, Kentucky has not expressly waived its immunity from suit for contract actions **brought in federal court**. *Campbell v. Univ. of Louisville*, 862 F. Supp. 2d 578, 585 (W.D. Ky. 2012).

Removing an action from state to federal court, however, constitutes a waiver of sovereign immunity in certain circumstances. *See Lapides v. Bd. of Regents of the*

---

[25] KRS § 45A.245(1) provides, in part: "Any person . . . having a lawfully authorized written contract with the Commonwealth . . . may bring an action against the Commonwealth on the contract . . . Any such action shall be brought in the Franklin Circuit Court."

*Univ. Sys. of Ga.*, 535 U.S. 613, 616 (2002); *id.* at 624. The rule in "*Lapides* is limited to state law claims for which the state has waived or abrogated its immunity . . . in the state trial courts." *Agrawal v. Montemagno*, 574 F. App'x 570, 573 (6th Cir. 2014); *cf. Lapides*, 535 U.S. at 617 ("[W]e must limit our answer to the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings."). Thus, "at least in some cases, a state waives its sovereign immunity by removing to federal court." *Retirement Lilly Invs. v. City of Rochester*, 674 F. App'x 523, 530 (6th Cir. 2017).

Here, the facts of the case fit squarely within the rule set forth in *Lapides*. Kentucky has waived its immunity from suit in its state courts for "*all* claims brought by *all* persons on *all* lawfully authorized written contracts with the Commonwealth," including the "inviolable contract" established by statute. *Rothstein*, 532 S.W.3d at 650–51 (emphasis in original); *see Ky. Ret. Sys.*, 396 S.W.3d at 837–38; KRS § 45A.245.

As such, when this case was originally filed in Franklin Circuit Court, Retirement Systems could not claim immunity and accordingly could be subjected to an adverse judgment. *See, e.g., Metzinger v. Ky. Ret. Sys.*, 299 S.W.3d 541, 542 (Ky. 2009) (involving an improper reduction in disability benefits); *Marango v. Ky. Ret. Sys.*, No. 2012-CA-002153-MR, 2014 WL 5314703, at *2–4 (Ky. App. Oct. 17, 2014) (concluding Retirement Systems had unlawfully reduced plaintiff's retirement

benefits). The Board then voluntarily chose to remove the case to federal court. It cannot now claim that Retirement Systems is immune from suit in federal court. A contrary result would lead to precisely the "anomalous or inconsistent" result the Supreme Court sought to avoid in *Lapides.* 535 U.S. at 619, 624. That is, Retirement Systems cannot fashion for itself an immunity that it did not possess in state court by voluntarily removing the action to federal court.

Accordingly, Retirement Systems has waived its sovereign immunity with respect to Plaintiffs' state law claims and may be subjected to a judgment for the full range of relief that Plaintiffs seek.

### B. Breach of the "Inviolable Contract" (Count II)

Having discussed the plain and unequivocal language of KRS § 78.852 in the course of traversing the Medicare Secondary Payer statute and Eleventh Amendment jurisprudence, and because Retirement Systems offers no other defense, the Court concludes that Retirement Systems breached the "inviolable contract."

Pursuant to the inviolable contract, as detailed above, Kentucky promised Plaintiffs health insurance coverage at no cost. By terminating that health insurance coverage, Retirement Systems (an arm of State) breached that contract. The inviolable contract between Plaintiffs and the Commonwealth of Kentucky is the equivalent of any other lawfully authorized written contract under KRS § 45A.245 to which the Commonwealth is a party. *See Ky. Ret. Sys.*, 396 S.W.3d at 838. It follows

then that by virtue of the right of action provided by KRS § 45A.245(1), Plaintiffs may bring an action to require Retirement Systems to live up to its contractual obligations. *Id.*; *Rothstein*, 532 S.W.3d at 549–50. Plaintiffs have done just that.

Accordingly, Retirement Systems through its Board of Trustees violated KRS § 78.852 and thereby breached the established inviolable contract. The Court will therefore grant summary judgement in favor of Plaintiffs on Count II.[26]

## III.    WILLIAM M. KERRICK'S MOTION TO INTERVENE

Kerrick's intervention in this controversy is permissive under Federal Rule of Civil Procedure 24(b), and he has claims that share "with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Therefore, in the interest of judicial economy and because it is within the Court's discretion to permit Kerrick to intervene, the Court will grant Kerrick's motion to intervene.

## IV.    CONCLUSION

In conclusion, the Court emphasizes the inviolable contract that the Commonwealth formed with plaintiffs and other retirees:

With limited exceptions not applicable here, § 78.852(1) states that:

For members who begin participating in the County Employees Retirement System prior to January 1, 2014, it is hereby declared that

---

[26] The Court thus need not reach Plaintiffs' alternate state law claims.

**in consideration of the contributions by the members** and in further consideration of benefits received by the county from the member's employment, **KRS 78.510 to 78.852 shall constitute an inviolable contract of the Commonwealth, and the benefits provided therein shall not be subject to reduction** or impairment by alteration, amendment, or repeal.

KRS § 78.852(1) (emphasis added).

Further, Section 2 of the Kentucky Constitution, ratified in 1891, states:

Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority.

By violating the "inviolable contract" to provide free medical insurance to the plaintiffs and other qualified retirees in return for their years of service, the Commonwealth exercised "absolute and arbitrary power." If the plan that Retirement Systems provided ran afoul of a federal statute or regulation—which this Court has concluded it did not—Retirement Systems was still required to come up with another plan that provided the medical coverage promised to these individuals, even if that meant the covered retirees would send their medical bills directly to the Commonwealth for payment.[27]

This attempt to violate the "inviolable contract" is a shameful act unworthy of this great State.

---

[27] The same result follows under § 19 of the Kentucky Constitution, prohibiting "any law impairing the obligation of contracts." KY. CONST. § 19(1).

Therefore, consistent with the accompanying Memorandum Opinion, it is hereby **ORDERED** that:

(1) Defendant's motion for summary judgment (Doc. 12) is **DENIED**;

(2) Plaintiffs' cross-motion for partial summary judgment (Doc. 21) is **GRANTED IN PART** as to Count II of the Amended Complaint and **DENIED IN PART** in all other respects;

(3) Plaintiffs' federal claim (Count V) is **DISMISSED** with prejudice;

(4) William M. Kerrick's motion to intervene (Doc. 1-6) is **GRANTED**; and

(5) The parties shall confer regarding the appropriate remedies in this matter and file a joint status report **on or before April 22, 2019**.

This 21ˢᵗ day of March 2019.



**Signed By:**

**_William O. Bertelsman_** _WOB_

**United States District Judge**

*River City Fraternal Order of Police Lodge 614, Inc.* et al.
*v. Ky. Retirement Sys.*

## 42 U.S.C. § 1395y(b)(1)(A)

**(b)** Medicare as secondary payer.

**(1)** Requirements of group health plans.

**(A)** Working aged under group health plans.

**(i)** In general. A group health plan—

**(I)** may not take into account that an individual (or the individual's spouse) who is covered under the plan by virtue of the individual's current employment status with an employer is entitled to benefits under this title under section 226(a) [42 U.S.C. § 426(a)], and

**(II)** shall provide that any individual age 65 or older (and the spouse age 65 or older of any individual) who has current employment status with an employer shall be entitled to the same benefits under the plan under the same conditions as any such individual (or spouse) under age 65.

**(ii)** Exclusion of group health plan of a small employer. Clause (i) shall not apply to a group health plan unless the plan is a plan of, or contributed to by, an employer that has 20 or more employees for each working day in each of 20 or more calendar weeks in the current calendar year or the preceding calendar year.

**(iii)** Exception for small employers in multiemployer or multiple employer group health plans. Clause (i) also shall not apply with respect to individuals enrolled in a multiemployer or multiple employer group health plan if the coverage of the individuals under the plan is by virtue of current employment status with an employer that does not have 20 or more individuals in current employment status for each working day in each of 20 or more calendar weeks in the current calendar year and the preceding calendar year; except that the exception provided in this clause shall only apply if the plan elects treatment under this clause.

**(iv)** Exception for individuals with end stage renal disease.

*River City Fraternal Order of Police Lodge 614, Inc.* et al.
*v. Ky. Retirement Sys.*

Subparagraph (C) shall apply instead of clause (i) to an item or service furnished in a month to an individual if for the month the individual is, or (without regard to entitlement under section 226 [42 U.S.C. § 426]) would upon application be, entitled to benefits under section 226A [42 U.S.C. § 426-1].

**(v)** "Group health plan" defined. In this subparagraph, and subparagraph (C), the term "group health plan" has the meaning given such term in section 5000(b)(1) of the Internal Revenue Code of 1986 [26 USCS § 5000(b)(1)], without regard to section 5000(d) of such Code [26 USCS § 5000(d)].

****

**42 U.S.C. § 1395y(b)(1)(C)**

**(b)** Medicare as secondary payer.

   **(1)** Requirements of group health plans.

. . . .

   **(C)** Individuals with end stage renal disease. A group health plan (as defined in subparagraph (A)(v))—

   **(i)** may not take into account that an individual is entitled to or eligible for benefits under this title [42 U.S.C. §§ 1395 *et seq.*] under section 226A [42 U.S.C. § 426-1] during the 12-month period which begins with the first month in which the individual becomes entitled to benefits under part A [42 U.S.C. §§ 1395c *et seq.*] under the provisions of section 226A [42 U.S.C. § 426-1], or, if earlier, the first month in which the individual would have been entitled to benefits under such part under the provisions of section 226A [42 U.S.C. § 426-1] if the individual had filed an application for such benefits; and

   **(ii)** may not differentiate in the benefits it provides between individuals having end stage renal disease and other individuals covered by such plan on the basis of the existence of end stage renal disease, the need for renal dialysis, or in any other manner;

   except that clause (ii) shall not prohibit a plan from paying benefits secondary to this title [42 U.S.C. §§ 1395 *et seq.*] when an individual is entitled to or eligible for benefits under this title [42

U.S.C. §§ 1395 *et seq.*] under section 226A [42 U.S.C. § 426-1] after the end of the 12-month period described in clause (i). Effective for items and services furnished on or after February 1, 1991, and before the date of enactment of the Balanced Budget Act of 1997 [enacted Aug. 5, 1997], (with respect to periods beginning on or after February 1, 1990), this subparagraph shall be applied by substituting "18-month" for "12-month" each place it appears. Effective for items and services furnished on or after the date of enactment of the Balanced Budget Act of 1997 [enacted Aug. 5, 1997][,] (with respect to periods beginning on or after the date that is 18 months prior to such date), clauses (i) and (ii) shall be applied by substituting "30-month" for "12-month" each place it appears.

****

## 42 U.S.C. 1395y(b)(2)(A)

**(b)** Medicare as secondary payer.

. . . .

**(2)** Medicare secondary payer.

**(A)** In general. Payment under this title [42 U.S.C. §§ 1395 *et seq.*] may not be made, except as provided in subparagraph (B), with respect to any item or service to the extent that--

**(i)** payment has been made, or can reasonably be expected to be made, with respect to the item or service as required under paragraph (1), or

**(ii)** payment has been made or can reasonably be expected to be made under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance.

In this subsection, the term "primary plan" means a group health plan or large group health plan, to the extent that clause (i) applies, and a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance, to the extent that clause (ii) applies. An entity that engages in a business, trade, or profession shall be deemed to have a

*River City Fraternal Order of Police Lodge 614, Inc.* et al.
*v. Ky. Retirement Sys.*

self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part.

****

## 42 U.S.C. 1395y(b)(3)(A)

**(b)** Medicare as secondary payer.

. . . .

**(3)** Enforcement.

**(A)** Private cause of action. There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).

KENTUCKY STATUTES

## Ky. Rev. Stat. Ann. § 78.852(1)

**(1)** For members who begin participating in the County Employees Retirement System prior to January 1, 2014, it is hereby declared that in consideration of the contributions by the members and in further consideration of benefits received by the county from the member's employment, KRS 78.510 to 78.852 shall constitute an inviolable contract of the Commonwealth, and the benefits provided therein shall not be subject to reduction or impairment by alteration, amendment, or repeal, except:

**(a)** As provided in KRS 6.696; and

**(b)** The General Assembly reserves the right to amend, reduce, or suspend any legislative changes to the provisions of KRS 78.510 to 78.852 that become effective on or after July 1, 2018.

****

## Ky. Rev. Stat. Ann. § 78.545(35)

*River City Fraternal Order of Police Lodge 614, Inc.* et al.
*v. Ky. Retirement Sys.*

The following matters shall be administered in the same manner subject to the same limitations and requirements as provided for the Kentucky Employees Retirement System as follows:

. . . .

(35) Hospital and medical insurance plan, as provided by KRS 61.702;

*River City Fraternal Order of Police Lodge 614, Inc.* et al.
*v. Ky. Retirement Sys.*